**WO**

1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8    Securities and Exchange Commission,     )     No.  CV-17-00427-PHX-SPL
                                             )
9                                            )
                        Plaintiff,           )
10   vs.                                     )     **ORDER**
                                             )
11                                           )
12   Luke C. Zouvas, et al.,                 )
                                             )
13                      Defendants.          )
                                             )
14   _____)

15          Before the Court is Plaintiff SEC's (the "SEC") Partial Motion for Summary

16   Judgment (Doc. 145)[1]; Defendant Larson, Jorgenson, and Schipretts' Response (Doc.

17   163),[2] Defendant Robb's Response (Doc. 177),[3] and Defendant Zouvas's Response (Doc.

18   179)[4]; and Plaintiff's Reply to Defendants Larson, Jorgenson, and Schiprett (Doc. 171),[5]

19   Plaintiff's Reply to Defendant Robb (Doc. 181), and Plaintiff's Reply to Defendant Zouvas

20

21          [1]     The accompanying documents include: Plaintiff's Statement of Facts (Doc.
22   146); Plaintiff's Declaration of Patrick R. Costello (Doc. 147); Plaintiff's Declaration of
     Keith A. O'Donnell (Doc. 148); and Additional Attachments to O'Donnell's Declaration
23   (Docs. 149, 150, 151, 152).
            [2]     The accompanying document is Defendant Larson, Jorgenson, and
24   Schipretts' Response to Plaintiff's Statement of Facts. (Doc. 164.)
25          [3]     The accompanying document is Defendant Robb's Response to Plaintiff's
     Statement of Facts. (Doc. 178.)
26          [4]     The accompanying document is Defendant Zouvas's Response to Plaintiff's
27   Statement of Facts. (Doc. 180.)
            [5]     The accompanying document is Plaintiff's Declaration of Carolyn Kurr.
28   (Doc. 172.)

(Doc. 182).[6]

Also before the Court is Defendant Larson, Jorgenson, and Schipretts' Motion for Summary Judgment (Doc. 153),[7] the SEC's Response (Doc. 159),[8] and Defendant Larson, Jorgenson, and Schipretts' Reply (Doc. 173).[9]

## I. BACKGROUND[10]

Israeli accountant, Asher Zwebner ("Zwebner"), organized Crown Dynamics ("Crown"), a shell company. At the time of Crown's initial public offering ("IPO"), Amir Rehavi ("Rehavi") and Chanah Zehavi ("Zehavi") were Crown's sole director and officer. Following a 3-for-1 split stock before the IPO, Crown's original subscription consisted of 7.5 million free-trading shares (the "Free-Trading Shares"), which various Israeli residents held (the "Israeli Subscribers"), and 9 million restricted shares (the "Restricted Shares"), which were held by Rehavi and Zehavi. In Fall 2011, Defendant Zouvas was approached by Defendant Larson to conduct due diligence on Crown on behalf of Airware Labs. Corporation ("Airware"), a company who wanted assistance in reverse merging Crown into a publicly-traded corporation. Defendant Zouvas conducted due diligence on Crown, which consisted of reviewing various documents.

Ultimately, the merger with Airware fell through, and a potential reverse merger with Steven Aninye ("Aninye") and his company, Zorah, LLC ("Zorah"), came to

---

[6]    The accompanying document is Plaintiff's Second Declaration of Patrick R. Costello. (Doc. 183.)
[7]    The accompanying document is Defendant Larson, Jorgenson, and Schipretts' Statement of Facts. (Doc. 154.)
[8]    The accompanying documents include: Plaintiff's Statement of Facts (Doc. 160); Plaintiff's Declaration of Daniel Rubenstein (Doc. 161); and Additional Attachments to Rubenstein's Declaration (Doc. 162).
[9]    Because it would not assist in resolution of the instant issues, the Court finds the pending motions are suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).
[10]    The following facts are undisputed unless otherwise noted.

fruition.[11] Defendant Robb recommended a reverse merger, and Larson suggested Crown.[12] Larson asked Zouvas to handle the formalities. Because Zouvas had just performed due diligence on Crown for the merger with Airware, he did not conduct due diligence on Crown for its potential merger with Zorah. Eventually, the parties settled on terms, and Larson loaned $300,000 to Aninye so he could purchase shares.[13] Once the funds from Larson were deposited into Zouvas's trust account—on behalf of Aninye—Zouvas sent $231,127 of the $300,000 to Israeli bank accounts held by Zwebner and Caroline Adler "("Adler"). Zwebner told Zouvas that Adler would distribute the funds to the Israeli Subscribers.

With the reverse merger complete, Larson and Robb asked Zouvas to transfer the Free-Trading Shares from the Israeli Subscribers and to the investor group, which included Jorgenson and Schiprett.[14] In so doing, Jorgenson and Schiprett acquired 1,312,500 shares. Zouvas also received shares in Crown, in exchange for his legal services, from an Israeli Subscriber, Shira Mizrahi. Larson did not know Mizrahi. Jorgenson and Schiprett subsequently sought to deposit their shares in a brokerage account, and upon request for verification of payment, Zouvas confirmed that he had received the consideration for the shares from Jorgenson and Schiprett and had remitted it to the Israeli Subscribers.

Larson eventually hired the Ritman Agency ("Ritman") to engage in a 90-day marketing campaign for Crown. Larson was the point of contact for Ritman and would review and edit materials provided to him by Ritman. Similarly, Robb prepared press releases. Ultimately, the Ritman campaign resulted in 83,760 shares being purchased by Ritman's broker network.

---

[11]     Zorah was in the business of specialized tracking devices and, as relevant here, owned the PomCom ("PomCom") tracking technology.

[12]     This is disputed.

[13]     This is disputed.

[14]     This is disputed. Jorgenson and Schiprett invested in Crown because Larson recommended it. Larson also loaned the two money to acquire shares in Crown.

## II.    STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, where different inferences can be drawn, summary judgment is inappropriate. *Boulder Oro Valley LLC v. Home Depot USA Inc*., No. CV-17-00453-TUC-DCB, 2019 WL 2106419, at *1 (D. Ariz. Mar. 26, 2019) (quoting *Sankovich v. Life Ins. Co. of North Am*., 638 F.2d 136, 140 (9th Cir. 1981)).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant is able to do so, the burden then shifts to the non-movant who "must do more than simply show that there is some metaphysical doubt as to the material facts," and, instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## III.    DISCUSSION

### A.    The SEC's Partial Motion for Summary Judgment

The SEC argues that Defendants are liable for scheming to defraud under Section 17(a)(3) of the Securities Act, 15 U.S.C. section 77q(a)(3), because their actions "demonstrate their negligent involvement in a scheme to manipulate the market for Crown stock." (Doc. 145 at 8.)

#### 1.    Section 17(a)(3) Discussion

##### a.    *Defendant Zouvas*

As to Defendant Zouvas, the SEC argues that Zouvas failed in his due diligence

duties. (Doc. 145 at 9.) It argues that Zouvas should have verified that the Israeli Subscribers were in fact legitimate investors, should have inquired into whether Zwebner was authorized to act on their behalf, and should have verified the various documents' authenticities. (Doc. 145 at 9, 11-12; Doc. 171 at 9-10.) It further argues that Zouvas was "not justified in relying on the signature guarantees affixed to the stock certificates" and that he "should have known he could not rely on the SEC's declaration of effectiveness of Crown's Form S-1." (Doc. 145 at 10; Doc. 171 at 6-7.) Therefore, the SEC argues that "it was Zouvas' negligence at the outset that substantially assisted the other Defendants in this case." (Doc. 145 at 10, 12.)

Zouvas argues that he made a reasonable determination not to track down the Israeli Subscribers based on the information provided to him by Zwebner. (Doc. 179 at 3.) He argues that the SEC's expert on the standard of care for attorneys does not take away the negligence claim from the jury. (Doc. 179 at 3.) He argues that, in fact, the SEC's own expert admitted that attorneys are given leeway in their due diligence duties, and, thus, based on these facts—which show a slue of documentation supporting the reasonable inference that Zwebner was the Israeli Subscribers' agent and that the documentation was legitimate—a jury could easily find that he acted reasonably under the circumstances when he reviewed the documentation. (Doc. 179 at 4-5.)

### b. Defendants Larson, Jorgenson, and Schiprett

As to Defendants Larson, Jorgenson, and Schiprett, the SEC argues that Jorgenson and Schiprett were negligent in:

> "(i) selling Crown shares that were not lawfully paid for; (ii) sending their brokerage an attestation letter saying they had paid the consideration for the shares; (iii) investing in Crown without realizing there was no active market for the stock; (iv) not knowing they were part of an investor group that controlled the entire supply of Crown's free-trading stock; and (v) selling Crown stock into a market that was primed and inflated by Larson's and Robb's marketing efforts."

(Doc. 171 at 10-11.)

Defendants Schiprett and Jorgenson argue that the SEC has not provided any evidence to support its claims that Schiprett and Jorgenson were negligent because their actions were proper and legal. (Doc. 163 at 2.) They argue that there is no duty under the securities laws that (1) requires an investor to research a company before it invests in its stock or (2) that an investor may not buy stock in a company where the market is new, and the investor will be buying all or a majority of the shares. (Doc. 163 at 2-4.) They also argue that it was perfectly proper for them to rely upon "investment advice of a knowledgeable [and long-time] friend." (Doc. 163 at 2, 4.) They argue that they did, indeed, buy and acquire Crown stock "because Larson recommended that they do so." (Doc. 163 at 3.) They argue that "There is nothing negligent – or in any other way wrongful – about any of that." (Doc. 163 at 3.)

As to Larson, the SEC argues that he was negligent in:

> "(i) directing Zouvas to disburse the free-trading shares to Jorgenson, Schiprett, and the investor group; (ii) advising Jorgenson and Schiprett when and how to sell the stock, and actually selling Jorgenson's shares for him; (iii) funding the Ritman Campaign with information he should have known was misleading, while knowing that Aninye desperately needed capital in order to make Crown the success Ritman was telling the market it would be; and (iv) engaging in wash trades to give the market the impression there was interest in the stock."

(Doc. 171 at 11.)

Larson argues that directing and advising Jorgenson and Schiprett to buy and sell Crown shares was completely legitimate. (Doc. 163 at 4.) He argues that he was not the person who recommended the reverse merger with Zorah; rather, he simply "suggested that Crown was a viable vehicle to effect the merger after Aninye had decided to proceed with it." (Doc. 163 at 4.) He argues that his actions regarding the Ritman campaign were proper because there is ample evidence supporting the conclusion that he believed the Ritman campaign's materials were accurate and that he was justified in relying upon Aninye's financial forecast of Crown. (Doc. 163 at 5-6.) He argues that he engaged Ritman for the purpose of encouraging investor interest in Crown stock, which is a legitimate and normal

practice. (Doc. 163 at 4.) He further argues that he was not negligent in "making a market for the stock" because "selling shares into a new trading market (or recommending that somebody else do so) is neither negligent not wrongful." (Doc. 163 at 6.) As to wash trades, he argues that he engaged in no such thing and, instead, "placed small buy orders in excess of the number of shares available on offer." (Doc. 163 at 7.) He argues that, in any event, the SEC has not provided any evidence to suggest that the number of shares he traded was sufficient to "create the appearance of a larger market." (Doc. 163 at 7.)

### c. *Defendant Robb*

The SEC argues that Robb was negligent in being intimately involved in the division of Crown shares, approving and submitting press releases knowing that Aninye needed capital, and because Robb was responsible for the press releases' accuracy. (Doc. 145; Doc 181.) Specifically, it argues that Robb facilitated Crown's reverse merger with Zorah and the distribution of stock. (Doc. 145 at 10.) The SEC also argues that Robb's and Larson's "investors" acquired Crown's Free-Trading Shares without paying for them. (Doc. 145 at 12.) It further argues that Robb "primed Crown for sale by inflating the stock price." (Doc. 145 at 14.)

Defendant Robb argues that he did nothing wrong and that his involvement with Crown was perfectly legitimate. (Doc. 177 at 1.) Specifically, he argues that, though he did speak with Larson regarding Zorah, he did not have any agreement with Aninye to divide Crown shares as result of the merger nor did he have any involvement in negotiations for the sale of Crown stock with the investors he "introduced" to Crown. (Doc. 177 at 2.) He argues that there is no evidence to support the accusation that he directed Crown shares to be transferred from the Israeli Subscribers to the investors he introduced to Crown. (Doc. 177 at 3.) He also argues that he believes the shares were, in fact, purchased by the investors from the Israeli Subscribers, noting that "Zouvas took care of the sale of stock." (Doc. 177 at 3.) Regarding the Ritman campaign, he argues that he sought the advice of Zouvas, through Larson, to make sure the campaign "was legal and compliant with securities laws." (Doc. 177 at 3.) Robb also argues that, to the extent anyone is "at fault for any press releases

with incorrect information in them," the fault is attributable to Aninye. (Doc. 177 at 3.) He argues that any information he received for the press releases came from Aninye and that Aninye "always authorized the content and the dissemination of all press releases issued by Crown." (Doc. 177 at 3.) Further, he argues that he cannot be held accountable for knowing Crown was "in desperate need of capital" because Robb "was not involved in the business operations of the company." (Doc. 177 at 4.)

### 2. Section 17(a)(3) Analysis

#### a. Failure to Comply/Objections

The SEC argues that the Court should strike various statements of fact—or admit them—in Defendant Larson, Schiprett, Jorgenson, and Zouvas' Controverting Statement of Facts because they did not comply with Local Rules 7.2(m)(2) and 56.1(b). (Doc. 171 at 6-7; Doc. 182 at 5.) The SEC further argues that it has cured two technical defects, pointed out by Defendants Larson, Schiprett, and Jorgenson regarding its Exhibit 33 and Mr. Cangiano's and Mr. Robbin's expert disclosure reports; thus, arguing the Court is now able to review those documents. (Doc. 171 at 7-8.) Moreover, the SEC argues that the Court should overrule Defendant Larson, Schiprett, and Jorgensons' objections as to the other exhibits it mentions in their Response because the documents had already been authenticated "during the depositions that took place in this matter." (Doc. 171 at 7, citing Doc. 172 ¶¶ 7-28.) Lastly, Defendants Larson, Jorgenson, and Schiprett argue that the Court should disregard certain sections in Mr. Cangiano's report because they are "impermissible generalization[s] not tailored to the facts of this case." (Doc. 164 ¶ 70.) The SEC responds that Mr. Cangiano, its expert on "market manipulation," is permitted to "testify to the usual factors inherent in a market manipulation and express an opinion as to whether those factors are present." (Doc. 171 at 8.)

After review, the Court finds that, though Defendants Larson, Schiprett, Jorgenson, and Zouvas did not comply with Local Rules 7.2(m)(2) and 56.1(b), the Court declines to strike essentially all of their responses to the SEC's statements of fact. While the SEC is correct in that they should not have included argument in their responses, the Court finds

that it can simply disregard portions of the response related to argument. As to the statements of fact that Defendants Larson, Schiprett, Jorgenson, and Zouvas claim to have no knowledge of, the Court declines to deem those admitted. Those particular statements of fact either do not "concern" Defendants Larson, Schiprett, and Jorgenson or Zouvas, a distinction that the SEC acknowledges (*see* Doc. 171 at 8 n.2), or they do sufficiently "dispute" the fact. As to the unverified reports, the Court finds that the SEC's curing of the technical default is sufficient. Further, the Court is puzzled with Defendant Larson, Schiprett, and Jorgensons' argument that Mr. Cangiano's expert testimony must be "tailored to the facts of this case." (Doc. 164 ¶ 70.) Federal Rule of Evidence 702 simply does not require that an expert "tie" his conclusions and opinions to the specific facts of the case; rather, his testimony needs to "help the trier of fact to understand the evidence." See Fed. R. Evid. 702 (Advisory Committee Notes, 2000 Amendment) (noting "the venerable practice of using expert testimony to educate the factfinder on general principles."). Thus, it will not disregard those sections in Mr. Cangiano's expert report.[15]

### b.    *Legal Standard*

Section 17(a)(3) of the Securities Act makes it unlawful for a person to, while in the offer or sale of securities, "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). This can be accomplished through "the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails." *Id.* In other words, to be held liable, a defendant must have (1) engaged in acts, practices, or courses of dealing

---

[15]    The Court notes that Defendant Larson, Jorgenson, and Schipretts' argument that "broad generalizations are not admissible summary judgment evidence" is, as stated, simply not accurate. *Jinro Am. Inc. v. Secure Investments, Inc*., 266 F.3d 993, 1005 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001), is easily distinguishable. The testimony there from the "expert" was improper because he was not reliable and his testimony was prejudicial. The Court *did not* hold that, generally, generalizations are not proper. In fact, it went on to explain a case in which that expert's "generalization" testimony was proper, namely, because it was not racially inflammatory and unreliable, the main issues in *Jinro*. 266 F.3d at 1008-09. Likewise, *Interwoven, Inc. v. Vertical Computer Sys.*, No. CV 10-04645 RS, 2013 WL 3786633, at *6 (N.D. Cal. July 18, 2013) simply has no bearing here, as it is explicitly referring to the doctrine of equivalents in a patent infringement case.

which operate as a fraud or deceit; (2) in the offer or sale of securities; (3) using interstate commerce or the mails; and (4) been negligent. *Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 700-01 (1980). A violation of Section 17(a)(3) does not require evidence of scienter; rather, a showing of simple negligence will suffice. *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001); *Aaron*, 446 U.S. at 701-02. Simple negligence is the absence of "reasonable prudence." *Dain Rauscher*, 254 F.3d at 856.

"Scheme liability is derived from the first and third prongs in Section 17(a) and Rule 10b-5." *S.E.C. v. Fraser*, No. CV-09-00443-PHX-GMSC, 2009 WL 2450508, at *9 (D. Ariz. Aug. 11, 2009) (citing *S.E.C. v. Fitzgerald*, 135 F. Supp. 2d 992, 1028–29 (N.D. Cal. 2001)). The fraudulent scheme inquiry looks to whether the defendant participated or substantially assisted in conduct that had a "principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006*), vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008). Specifically, "the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Id.*

### c. *Discussion*

#### (1) Defendant Zouvas

Here, first, the Court finds that, though Zouvas "disputes the credibility of [Mr. Robbins'] expert witness report," he does not explain why nor moves to strike Robbins' testimony nor offer a *Daubert* analysis. (*See, e.g.*, Doc. 180 ¶ 20.) He also does not provide the Court with any alternative standard of care to consider or another expert's testimony. Therefore, the Court treats as uncontroverted Robbins' standard of care of an attorney. *See Carson v. Depuy Spine, Inc.*, 365 F. App'x 812, 814 (9th Cir. 2010) (citing *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001)) (stating that a "party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment.").

Second, Zouvas's main contention in response to the SEC's motion is that negligence essentially cannot be determined at the summary judgment stage because it is "a classic jury question[]." (Doc. 179 at 5.) He also argues that because the jury could, upon the same set of facts, "draw inferences different from those offered by the SEC," summary judgment is inappropriate. (Doc. 179 at 5.) The Court disagrees. Zouvas is correct in that questions of negligence are typically reserved for the jury; however, a court is not precluded from granting summary judgment on a finding of negligence where the facts lend themselves to only that conclusion. Indeed, if the Court took Zouvas's argument at face value, no court would ever be permitted to grant summary judgment in a negligence case.

Further, Zouvas is also correct in that, if a jury could come to a different conclusion on the same set of facts, summary judgment is inappropriate. However, that is not the case here. A review of the uncontroverted facts (basically all of them) reveal that, indeed, "the Court's only choice is to accept the inferences offered by the SEC." (Doc. 179 at 4.) The parties agree that Zouvas reviewed varying documents in performing his due diligence duties. However, as the SEC clarified, "the point here is not that Zouvas reviewed [the documents], but that a review of the information, standing alone, is insufficient for a reasonably prudent securities attorney in like circumstances to discharge his due diligence obligations." (Doc. 182 at 10.) The SEC's expert, Mr. Robbins, opined on what a reasonably prudent attorney would or should have done in Zouvas's situation.[16] For example, Zouvas should have (1) inquired into his buying of shares from Mizrahi, a client to whom he had a conflict of interest (Doc. 148-8 at 8-9); (2) verified that the funds he wired to Zwebner were actually dispersed to the Israeli Subscribers (Doc. 148-8 at 7, 10); and (3) confirmed Zwebner's claim that he was the agent for the Israeli Subscribers (Doc. 148-8 at 7). Given Zouvas's lack of contrary evidence as to the applicable standard of care

---

[16]     Because this is a reasonable prudence standard, it is irrelevant what Zouvas actually did—the inquiry is what a reasonably prudent attorney in his circumstances would or should have done.

and reliance upon his due diligence work, which is undisputedly limited to reviewing documents, no reasonable juror reviewing the applicable standards of care as offered in Robbins' expert report (which is not meaningfully disputed by Zouvas) could conclude that Zouvas was not negligent in performing his due diligence duties under the circumstances. As such, the Court grants summary judgment as to Defendant Zouvas.

(2) Defendants Larson, Jorgenson, and Schiprett

First, the Court rejects Defendant Larson, Schiprett, and Jorgensons' argument that the SEC did not adequately plead a Section 17(a)(3) claim based on negligence. A simple review of the Complaint establishes that the SEC did, in fact, properly state a claim under Section 17(a)(3). *See Fecht v. Price Co.*, 70 F.3d 1078, 1082 n.4 (9th Cir. 1995) (stating that Rule 9(b) permits general pleading for "condition of mind."). Moreover, the SEC did include negligence as grounds for Defendant Larson, Schiprett, and Jorgensons' liability. (*See* Doc. 1 ¶ 80.) Moreover, it is telling that Defendant Larson, Jorgenson, and Schiprett did not move to dismiss nor move for a more definitive statement regarding this issue, despite Claim II in the Complaint clearly identifying Section 17(a)(3) as the source of liability. (Doc. 1 at 23.)

As to the merits, the Court will first address Defendants Schiprett and Jorgenson. The Court finds that Schiprett and Jorgenson have provided sufficient evidence to survive summary judgment. First, it is disputed whether the original Crown shares were, in fact, lawfully acquired. (Doc. 146 ¶ 18; Doc. 164 ¶ 18.) Though the SEC argues that Jorgenson and Schiprett have "no evidence to show the Israeli subscribers actually received the consideration, or ever were bona fide investors to begin with" (Doc. 171 at 11), Jorgenson and Schiprett point to the SEC's evidence that there are share purchase agreements, records listing ownership of the stock, and that stock was transferred to the Israeli Subscribers. (Doc. 164 ¶ 18.) While the SEC argues that these documents do not "create a *genuine* dispute, considering that the subscribers themselves have testified empathetically that they were not legitimate investors," the Court disagrees. It is for the jury to decide whether to credit the authenticity of the relevant documents and Jorgenson and Schipretts' testimony

12

or whether they will credit the Israeli Subscribers who allege they "were not legitimate investors." (Doc. 171 at 11.)

There is also a genuine issue of material fact as to whether these two investors, who undisputedly relied upon their more experienced friend (Larson), should have researched the company in which they ultimately bought and sold shares. The Court cannot say that a reasonably prudent person in the same situation could not or should not have relied upon a knowledgeable friend when deciding to buy and sell stock of a certain company. While it might have been wise for Schiprett and Jorgenson to research Crown before ultimately investing, as opposed to simply relying upon Larson's recommendation, the Court cannot say that they were negligent in deciding to not "look into" Crown before deciding to invest.

Further, there is evidence that Schiprett and Jorgenson bought and sold stock. (Doc. 164 ¶¶ 18, 52, 56, 58, 59.) It is disputed whether Larson forwarded the funds to Zouvas, who forwarded the funds to Zwebner, who was to forward the funds to Alder for the benefit of the Israeli Subscribers. It is also disputed whether the share purchase agreements of the Israeli Subscribers are legitimate. Neither dispute, however, changes the inquiry into whether a reasonably prudent person in their situation should not have relied upon their friend's recommendation to initially invest and ultimately sell stock without independently researching the company or its current subscribers. Moreover, a jury could find that, even if Larson ultimately did not send Zouvas the funds he loaned Jorgenson and Schiprett, that that action is not negligence on the part of Schiprett and Jorgenson, but of Larson. Ultimately, the Court agrees with Schiprett and Jorgenson in that the SEC has not established that there was any duty—as opposed to engaging in better business acumen— for Schiprett and Jorgenson to investigate and research, independently, in this situation, whether it be to research Crown, its original subscribers, or the relevant market. As there are genuine issues of material fact here, the Court denies summary judgment as to Schiprett and Jorgenson.

As to Larson, the Court also finds that there are genuine issues of fact that could lead a reasonable juror to conclude Larson was not negligent. First, like with Schiprett and

Jorgenson, the Court cannot conclude that Larson was negligent for "making a market for stock" because he placed sell orders for Jorgenson and advised Schiprett when to sell. (Doc. 145 at 18.) Any negative inference a jury could draw from otherwise legitimate conduct is not a matter for the Court to decide here. Second, it is undisputed that Larson hired Ritman to engage in a marketing awareness program.[17] He testified that he hired Ritman because Aninye "would have the opportunity to raise capital, [and could] also pay [Larson] back. And [Larson] had two of [his] very best friends in the whole world that were shareholders, so [he] wanted to see the company succeed." (Doc. 154-2 at 42.) Though Larson admitted that he would make corrections to written pieces Ritman would send him, he testified that he would have made changes if he believed the information was not accurate. Given that Aninye had represented that his product was indeed legitimate and that he had a business plan in place, along with contracts ready to be executed for the devices, a reasonable juror could conclude that Larson was justified in relying upon Aninye's projections about his product and the capability of going to market. (Doc. 154-2 at 46.) This would be a reasonable conclusion even if Larson was aware that Aninye needed more capital—like Larson points out, publicly traded companies are always on the look out for capital, which was one of the bases for Larson's claimed purpose for hiring Ritman. (Doc. 154-2 at 46.)

Third, Larson testified that his initial "concern" in March of 2012 was due to his belief that Aninye was unable to execute on the contracts he had for his products, not because Larson believed Aninye lacked the necessary capital. (Doc. 154-2 at 46.) Moreover, it is undisputed that Ritman's summary does indeed list a projected revenue in 2012 as $5,591,000. (Doc. 151-7 at 3.) That projection however is not evidence alone that Larson acted negligently in approving that summary. A reasonable juror could conclude that, though the *projected* revenues might have been a stretch, that the summary was issued well before Larson started to have "concerns" about the actual selling of products and

---

[17]     The Court overrules Defendant Larson, Schiprett, and Jorgensons' objection that Ritman is not relevant in this matter because the SEC does not allege wrongdoing on its part. (*See e.g.*, Doc. 164 ¶ 67.)

Aninye's increasing inability to successfully serve as CFO. Thus, a jury could find that the projected revenue was not itself misleading or inaccurate. Fourth, as to the "wash trades," there is a dispute as to Larson's purpose for "buying orders" of Crown stock. (Doc. 171 at 14.) The SEC claims that "a reasonable person in Larson's circumstances would have not bought and sold stock of a company whose very foundation was in question the whole time." That conclusion, however, is susceptible to debate. Larson testified that he wanted Crown to succeed, that he had himself invested in the company, and believed in Aninye's products and his representations about the ability to ultimately go to market.

Thus, there are genuine disputes of material fact as to Defendants Larson, Jorgenson, and Schiprett, which preclude the Court from granting summary judgment. While a reasonable juror could conclude on these facts that Defendants Larson, Jorgenson, and Schiprett did engage in a fraudulent scheme and were negligent, the Court cannot conclude that as a matter of law.

(3)     Defendant Robb

Here, the Court finds that the evidence provided by Robb is enough to survive summary judgment. Though it is uncontroverted that the Israeli Subscribers "empathetically" deny that they were legitimate investors (Doc. 181 at 6), that does not require a finding that Robb was negligent in not initially pursuing that inquiry. Further, though Zouvas stated in his deposition that Robb "directed him to transfer Crown shares to their investors," he also qualified that statement and explained that, when he said "transfer," he meant that Robb and Larson would provide him information, presumably, about the "investors." (Doc. 181 at 6.) Also, simply because Robb knew personally the owners of Netlynx Solutions Limited and Opal Management Incorporated—two investors of Crown—or otherwise "brought" certain investors to Crown, does not compel a finding of negligence. Indeed, Robb has argued that he did "introduce investors to Crown" but that they "acted independently of Robb and Larson." (Doc. 177 at 2.) The fact that Robb signed "an irrevocable stock power on [Netlynx's] behalf to move the process forward" and facilitated "getting Netlynx's share certificate transferred" does not mandate a finding that

15

the "brought-in investors" did not act independently. A reasonable juror could conclude that Robb was helping his longtime friend with business—not usurping Netlynx's independence.

Further, the Court cannot say that a reasonable juror would be compelled to conclude that Robb's knowledge that Crown "needed capital" is indicative of negligent conduct in releasing the press releases. It is not remarkable that a company "needs" capital to function, and it is certainly not unsurprising that Robb would state that "Crown is a publicly traded company and there's – you know, there's investors involved." (Doc. 181 at 13). That is an undisputedly true statement; whether the jury will infer a deceptive motive or that Robb should have known better or whether it could infer that Robb was obviously aware and concerned that investors would be affected by Crown's success or failure, is not for the Court to decide. This is further supported by Robb's testimony that Aninye had told him Aninye had "already raised capital. So [he] didn't know what – to what level [Aninye] needed capital." (Doc. 178-2 at 3.)

The SEC also goes to great lengths to explain how the situation of Robb's "temper tantrum" and general actions regarding Aninye's lack of knowledge regarding the raising of capital, stock trading, and generally of his inability to run a successful publicly traded company fit its theory that he was negligently pushing inaccurate press releases into the market. (Doc. 181 at 10.) However, Robb offers evidence explaining that Aninye was involved in the drafting process of the press releases (and was asked to review and change the material), that the information from the press releases came from Aninye (at least in part from his own "projection" paper), and that Robb believed, based on Aninye's representations, that the product was ready to enter the market. (Doc. 178-2 at 2-4.) Whether one will credit Robb or the SEC's version of who and what Robb should have relied upon in determining that PomCom was or could have been ready to enter the market is for the jury. The Court cannot say that the SEC's narrative is the only theory a reasonable jury could conclude on these facts. Therefore, the Court denies summary judgment as to Robb.

### 3.     Injunctive Relief

Injunctive relief is appropriate where the SEC establishes (1) a violation of the federal securities laws and (2) a reasonable likelihood of future violations. *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996). In determining whether there is a likelihood of future violations, courts consider the following factors: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations. *Id.*

Here, the claim against Zouvas is the only appropriate claim to be considered for injunctive relief. The SEC argues that all of the factors weigh in favor of injunctive relief. (Doc. 145 at 19.) Zouvas did not respond to this argument. Having reviewed the *Fehn* factors and considering Zouvas's lack of argument, the Court finds that a permanent injunction here would be appropriate to enjoin Zouvas from continuing to violate the securities laws.

### 4.     Disgorgement/Prejudgment Interest

"Another remedy available in SEC actions involving securities violations is disgorgement of profits." *S.E.C. v. Indigenous Glob. Dev. Corp.*, No. C-06-05600 JCS, 2008 WL 8853722, at *17 (N.D. Cal. June 30, 2008), *aff'd*, 402 F. App'x 250 (9th Cir. 2010) (citing *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993)). One of the purposes of disgorgement is to make securities violations unprofitable. *Id.* A court has wide discretion in determining if disgorgement is appropriate and if prejudgment interest should be awarded for the purpose of "ensur[ing] that the wrong-doer does not profit from his wrongful conduct." *Id.* (citing *SEC v. Cross Fin. Servs., Inc*., 908 F. Supp. 718, 734 (C.D. Cal. 1995)).

Again, the only claim at issue here is against Zouvas, to which he did not respond. As such, after reviewing the SEC's calculations (Doc. 147 at 2-3 ¶¶ 4, 5) and considering the purpose of disgorgement and assessing prejudgment interest, the Court finds that the

calculations are reasonable and that the SEC is entitled to disgorgement in the amount of $79,173 and prejudgment interest in the amount of $15,296.55.

### 5.     Advice of Counsel Defense

Defendants Larson, Jorgenson, Schiprett, and Robb argue that they are entitled to rely upon an advice of counsel defense. Defendant Zouvas argues that he is entitled to an "advice of client" defense. An advice of counsel defense requires the defendant to prove that he: (1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied on the advice in good faith. *S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985) (citing *S.E.C. v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981)).

As to Zouvas's "advice of client" defense, the SEC argues that it should fail because the Court should find that Zouvas was negligent here. (Doc. 145 at 22.) Zouvas does not address this claim in his Response. The Court has found that Zouvas as negligent in relying upon his clients and third parties. Thus, to the extent this defense is applicable, the Court grants summary judgment as to Zouvas.

As to Larson, he does not address the first element of the defense because, he argues, "The whole point of engaging Zouvas was that relevant facts would be uncovered through due diligence." (Doc. 163 at 10 n.2.) While this is unavailing, the Court finds that there is specific documentation showing what Larson asked of Zouvas. (Doc. 163 at 8-9.) Next, it is undisputed that Larson retained Zouvas to ensure the Crown merger complied with applicable law—that the "I's [were] dotted T's crossed."[18] (Doc. 163 at 8.) Lastly, Zouvas did indeed provide Larson with his legal advice, to which Larson relied. (Doc. 163 at 9.) Thus, Larson may proceed with this defense. As to Jorgenson and Schiprett, they also do not address the first element because "The whole point of engaging Zouvas was that

---

[18]     The Court notes that the SEC is correct in that this defense would be limited to "Zouvas's advise for the initial acquisition of Crown, not in connection with the later sale of stock in the market." (Doc. 171 at 16; Doc. 164 ¶ 119.)

relevant facts would be uncovered through due diligence." (Doc. 163 at 10 n.2.) However, here, unlike with Larson, Jorgenson and Schiprett do not meet elements one and two, and, thus, they may not claim an advice of counsel defense.

As to Robb, he has failed to establish an advice of counsel defense. Though he states that he did rely on advice from Zouvas, though through Larson, he admits that he did not retain Zouvas to provide him any legal advice related to Crown, that Robb was not a client of Zouvas, and that he did not provide any information to Zouvas. (Doc. 178 ¶¶ 124-26.) Other than conclusory stating that he "made disclosures (if applicable)" to Zouvas, Robb points to no supporting evidence for this statement. (Doc. 177 at 4.) Thus, he fails to establish an advice of counsel defense.

Thus, based on the reasons stated above, the Court grants summary judgment as to Zouvas and denies summary judgment as to Larson, Schiprett, Jorgenson, and Robb. The Court will enjoin Zouvas and assess disgorgement and prejudgment interest to account for his securities violations. Only Defendant Larson may proceed with the advice of counsel defense.

### B.  Larson, Jorgenson, and Schipretts' Motion for Summary Judgment

Defendants Larson, Jorgenson, and Schiprett move for summary judgment on all claims (Counts I-IV) because "Every one of the SEC's claims against Larson, Schiprett, and Jorgenson depends on the existence of a nominee trading scheme. Because there is no scheme, the SEC's claims fail, and judgment in favor of Larson, Schiprett, and Jorgeson is appropriate." (Doc. 153 at 1.)

### 1.  Discussion

There are a few "new" facts alleged in Defendant Larson, Jorgenson, and Schipretts' motion. Those include: (1) that Larson, Jorgenson, and Schiprett have known each other for approximately 20 years; (2) for almost a decade, Jorgenson and Schiprett have worked at National Cash and Credit, LLC ("NCC"), a pawn shop and lending business owned by Larson; and that (3) the three of them had discussed for years that Jorgenson and Schiprett wanted to invest in NCC but could not because they did not have the capital. (Doc. 153 at

4.) Larson recommended that Schiprett and Jorgenson buy some of the Crown shares in hopes that they would make some money, and Larson loaned them the cash to do so. (Doc. 153 at 4-5.) Larson, Jorgenson, and Schiprett also allege that, after Jorgenson and Schiprett bought Crown shares and sold them—making a profit of about $910,000—they "used the bulk of those proceeds to fund the long discussed purchase of 70% of NCC." (Doc. 153 at 5.) Once Schiprett and Jorgenson accumulated their $910,000, they were able to purchase the $950,000 needed to buy their 70% interest in NCC.[19] (Doc. 153 at 5.)

The crux of Defendant Larson, Jorgenson, and Schipretts' motion is that the SEC's claims against them are based on Jorgenson and Schipretts' status as "nominees" of Larson, and that, because they are not nominees, summary judgment is appropriate. (Doc. 153 at 6.) They also argue that there is no evidence of a scheme. (Doc. 153 at 6.) They also argue that the SEC has no evidence proving scienter. (Doc. 153 at 7-8.) The SEC claims there is evidence both establishing scheme liability and scienter; thus, summary judgment is improper. (Doc. 159.) Specifically, it argues that the following items are in dispute: (1) the $300,00 loan to Aninye from Larson, (2) Larson's motivation for getting involved with Crown and his role in the company, (3) whether Larson actually loaned Jorgenson and Schiprett money to acquire Crown shares, (4) Jorgenson's and Schiprett's use of proceeds from their Crown shares, (5) whether Larson did actually trigger reporting requirements, (6) Larson's true intentions in funding the Ritman Campaign, (7) Larson's thoughts on why he was trading on his own, and (8) why Larson included his brother in Crown. (Doc. 159 at 6-18.)

**2.    Analysis**

Defendant Larson, Jorgenson, and Schipretts' Motion for Summary Judgment is based on the same underlying facts and alleged "scheme liability," which the Court addressed in the SEC's Partial Motion for Summary Judgment addressing Section 17(a)(3)

---

[19]    Larson, as a certified public accountant, calculated the purchase price of 70% of his company, National Cash and Credit, LLC. (Doc. 153 at 5.) Schiprett and Jorgenson were able to "fund[] additional amounts through capital contributions to NCC" to make up the difference. (Doc. 153 at 5.)

liability. Here, however, the Court is also assessing claims which require scienter, which can be proved either by recklessness or actual knowledge, *Gebhart v. S.E.C.*, 595 F.3d 1034, 1040 (9th Cir. 2010).

Here, there is a genuine issue of fact as to whether Larson acted with scienter. A jury could determine that Larson's timing of the Ritman campaign, along with his recommendation that Jorgenson and Schiprett sell during that time, is evidence of his intent to manipulate the market to gather short term gains for his investor group, or, in other words that he " engaged in conduct that had the principal  purpose and effect of creating a false appearance of fact." *S.E.C. v. Fraser*, No. CV-09-00443-PHX-GMSC, 2009 WL 2450508, at *10 (D. Ariz. Aug. 11, 2009). This is especially true where the SEC points to evidence that suggests Larson was wash selling. (Doc. 159 at 16.) The SEC also points to evidence controverting that Larson's loan to Aninye and Larson's loan to Jorgenson and Schiprett is suspect and a sham. (Doc. 159 at 6, 9.) However, the Court cannot find that a reasonable jury would impute scienter on Jorgenson and Schiprett. The SEC admits that Jorgenson and Schiprett bought stock in NCC—there is simply no evidence to establish a level of recklessness or knowledge sufficient for scienter. (Doc. 159 at 10-11.) Further, the Court has already determined that fact issues remain as to the Section 17(a)(3) claims against Defendants Larson, Schiprett, and Jorgenson.

### 3.    Conclusion

For the reasons stated above, the Court grants summary judgment as to Counts I, III, and IV as to Defendants Jorgenson and Schiprett but denies summary judgment as to them on Count II. The Court denies summary judgment as to Larson for all Counts.

## IV.    CONCLUSION

Based on the reasons stated above, the Court grants Plaintiff's request for summary judgment against Zouvas for Count II but denies summary judgment as to Larson, Schiprett, Jorgenson, and Robb for Count II. The Court will enjoin Zouvas and assess disgorgement and prejudgment interest to account for his securities violations. Only Defendant Larson may proceed with the advice of counsel defense. Further, the Court

grants summary judgment as to Counts I, III, and IV as to Defendants Jorgenson and Schiprett but denies summary judgment as to them on Count II. The Court denies summary judgment as to Larson for all Counts. Accordingly,

**IT IS ORDERED**:

1. That Plaintiff's Partial Motion for Summary Judgment (Doc. 145) is **granted in part** and **denied in part**;

2. That Defendant Larson, Jorgenson, and Schipretts' Motion for Summary Judgment (Doc. 153) is **granted in part** and **denied in part**;

2. That Defendant Zouvas, Jorgenson, Schiprett, and Robbs' advice of counsel defenses are stricken;

3. That Defendant Zouvas is permanently restrained and enjoined from violating, directly or indirectly, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), in the offer or sale of any security, by using any means or instruments of transportation or communication in interstate commerce or by using the mails, directly or indirectly, to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. As provided in Rule 65(d)(2) of the Federal Rules of Civil Procedure, this paragraph also binds those who receive actual notice of this Order by personal service or otherwise, which include: (i) Defendant Zouvas's officers, agents, servants, employees, and attorneys; and (ii) other persons in active concert or participation with Defendant Zouvas or with his officers, agents, servants, employees, and attorneys;

4. That Defendant Zouvas is liable for disgorgement, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest, as set forth below, pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d):

Zouvas is liable for disgorgement of **$79,173** and prejudgment interest of **$15,296.55** for a total judgment of **$94,469.55**;

Defendant Zouvas must satisfy his respective obligation by paying the above total judgment amount to the SEC within fourteen (14) days after entry of this Order. Defendant Zouvas may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment also may be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant Zouvas may also pay by certified check, bank cashier's check, or United States postal money order payable to the "Securities and Exchange Commission," which shall be delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter (i) identifying the case title, civil action number, and name of this Court; (ii) referencing Defendant Zouvas as a defendant in this action; and (iii) specifying that payment is made pursuant to this Order. Defendant Zouvas shall simultaneously transmit photocopies of evidence of payment and case identifying information to the SEC's counsel in this action. By making these payments, Defendant Zouvas relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to him. The SEC shall send the funds paid pursuant to this Order to the United States Treasury.

The SEC may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures) at any time after fourteen (14) days following entry of this Order. Defendant Zouvas shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961;

5. That any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant Zouvas under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant Zouvas of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19);

1        6. This Court shall retain jurisdiction of this matter and of Defendants for the

2  purposes of enforcing the terms of this Order and for resolving the SEC's remaining claims

3  and remedies against Defendants in the Complaint; and

4        7. That the Clerk shall enter judgment accordingly.

5            Dated this 23rd day of August, 2019.

 

 

Honorable Steven P. Logan
United States District Judge